1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERT GUCCIARDO,                      No.  2:13-cv-00323 AC

12                    Petitioner,

13        v.                                ORDER AND FINDINGS AND
                                            RECOMMENDATIONS
14   WILLIAM KNIPP,

15                    Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed February 20,

19   2013, challenging petitioner's 2010 conviction for multiple child sex offenses.  ECF No. 1.

20   Respondent has answered.  ECF No. 9.  Petitioner did not file a reply.

21                              BACKGROUND

22        Trial Court Proceedings

23        The following statement of the case is taken from the unpublished opinion of the

24   California Court of Appeal on direct review:[1]

25             A. Factual and Procedural Background

26             Defendant Robert Gucciardo sexually abused his adopted daughter

27   _____

28   [1]  The undersigned has independently reviewed the trial record, and confirms the accuracy of the
     state court's recitation of the evidence presented at trial.

                                            1

from ages 11 to 18….

In 1999 defendant began dating the victim's mother, and eventually the pair married. The victim, her mother, and her younger brother moved into defendant's home. Not long afterward, defendant began abusing the 11-year-old victim. The abuse continued until the victim was 19 and reported it to law enforcement.

An information charged defendant with nine counts of committing lewd acts with a child under 14 years of age (counts one through nine), four counts of committing lewd acts with a child of 14 or 15 years of age (counts ten through thirteen), and two counts of unlawful intercourse with a minor (counts thirteen through fifteen). (Pen. Code, §§ 288, subds. (a), (c)(1), 261.5, subd. (c).) [N.1] A jury trial followed.

[N.1. All further statutory references are to the Penal Code unless otherwise designated.]

Defendant's Relationship with the Victim

When the victim was 11, defendant touched her breasts while rubbing ointment on her chest. He later told her the touching was intentional and asked her how she felt about it. Three weeks later, the victim touched defendant's penis when he asked her to. Around the same time, defendant rubbed her vagina with his hand.

The victim was happy in her new home. Defendant took her and her brother to an amusement park and museums, and bought clothes for them. Defendant also paid for ballet and piano lessons for the victim.

Beginning when the victim was 12, defendant had her touch his penis with her hand. Defendant had sexual intercourse with her when she was 12. The victim provided details of the incident, including the location and her position. Defendant also coached her on how to perform various sexual acts.

Following these incidents, defendant began coming into the victim's room three times a week; on most of these occasions, defendant would have sexual intercourse with her. Defendant and the victim would orally copulate one another. Defendant occasionally abstained from sexual intercourse, but never for more than two weeks.

When the victim was 13, defendant and her mother separated and ultimately divorced. The victim's mother moved out of the home; the victim and her brother remained with defendant.

The victim wanted to stay with defendant because he was a good father and she loved him. Defendant also told the victim her mother was unfit. Throughout the legal proceedings surrounding the guardianship, child custody, and adoption, the victim never revealed the ongoing sexual abuse, though she spoke to a court-appointed therapist and a family therapist. Even when specifically

questioned about abuse, she lied and said there were no problems. She testified defendant told her if she said anything, the authorities would take her away and no one would take care of her.

When the victim was 14, she began sleeping in defendant's bedroom. Defendant began to attempt anal intercourse with her, trying on several occasions. Defendant put his finger in her anus four times. [N.2]

[N.2. Defense counsel insisted the police report stated only one attempt at anal intercourse.]

The sex acts became less frequent when the victim turned 15. However, the type of sex acts, including oral sex and intercourse, remained constant.

When the victim turned 16, defendant abused her once or twice a week. The frequency lessened to once a week when she turned 17. The frequency of the sexual acts was also affected by defendant's heart attack and knee surgeries. The frequency of abuse lessened further when the victim turned 18, to once a month or once every three months.

During these years, defendant had the victim watch sex videos and played them during sexual activity. Defendant also encouraged her to take nude photos of herself and bought her lingerie. The videos, photos, and lingerie were entered into evidence.

At age 19, the victim told defendant she had had sex with her boyfriend. Defendant threatened to kill himself and the victim, and she moved out of defendant's house that night.

The Victim Reports the Abuse—The Pretext Call

In 2008 the victim reported the sexual abuse to police. Law enforcement arranged for her to make a pretext call to defendant.

The transcript of the call omits part of the conversation between the victim and defendant. The victim could not recall the omitted portion but speculated they merely exchanged greetings. The officer who recorded the call testified the gap consisted of only five seconds and the transcript was accurate. The jury heard the taped conversation.

During the call, defendant admitted having sex with the victim. He also admitted having sex with her over a long period of time. Defendant claimed he was not having sex with her anymore.

The victim said she was not comfortable having sex with defendant anymore.

Defendant responded: "That's fine. The sex has never been an issue. And you know that." The victim later asked, "But like you used to enjoy having sex with me, right?" Defendant replied, "Sure."

3

Defendant and the victim discussed what they would have done had she become pregnant. Defendant told her if she became pregnant they did not have to tell anyone he was the father.

The victim said she might want to tell others about their relationship. Defendant told her it was not a good idea, because people would not understand.

The victim testified defendant sometimes had a hard time understanding things that are said during phone conversations. She also testified she saw no scarring on defendant's genitalia. She admitted perjuring herself with respect to the location of a meeting she had had with the prosecutor.

Expert Testimony

Dr. Anthony Urquiza testified about child sexual abuse accommodation syndrome. Urquiza admitted he was not familiar with the victim, had not read documents related to the case, and was not offering an opinion as to whether the victim was, in fact, molested.

Urquiza testified victims often delay disclosing abuse when the abuser is someone with whom they have a long-term relationship. He also stated that approximately one-third of abuse victims do not disclose the abuse until they are over 18. Some victims conceal the abuse even when asked directly about it.

The syndrome consists of the following components: (1) secrecy— generally child victims do not immediately disclose the abuse; (2) helplessness -- abusers often have control over the child; (3) entrapment and accommodation -- the victim feels trapped and copes by compartmentalizing feelings about the abuse; (4) delayed and unconvincing disclosure; and (5) rejection, a retraction of truthful abuse allegations.

Urquiza acknowledged that research reveals some children do make false allegations. During cross-examination, defense counsel posed a hypothetical based on the facts at trial. Defense counsel asked Urquiza to assume there was regular contact between a child and a therapist for two-and-a-half years; the therapist gave assurances of confidentiality and then asked the child if anything was happening. Would that afford an opportunity for the child to disclose abuse? Urquiza responded that although the situation might be comfortable, it was not confidential because therapists are required to report abuse to law enforcement. A therapist would also have to disclose this requirement to a patient.

Urquiza testified abuse distorts the victim's world view. This distortion can cause problems later in life with relationships, mental health issues, and drug or alcohol abuse.

Defense Case

Defendant presented testimony by the victim's brother, defendant's

4

biological daughter, a woman who had a relationship with defendant, defendant's ex-wife, and a urologist. Defendant also testified in his own behalf.

## The Victim's Brother

The victim's 16-year-old brother testified he never saw the victim sleep anywhere but in her own bed. According to the brother, he never saw any inappropriate behavior between defendant and his sister.

Prior to defendant's arrest, the victim moved out of the house and into an apartment with her boyfriend. When her brother was 15, the victim offered him marijuana. When the victim's brother told defendant about this, he became angry and confronted the victim and her boyfriend. The boyfriend pushed defendant in the chest. After moving in with her boyfriend, the victim developed a bad temper and began speaking very rapidly. She constantly talked about her boyfriend.

One day the victim and her boyfriend came to her brother's school. According to the brother, "She basically told me that my father had been raping her like since we met him...." The victim's brother said something in response and her boyfriend grabbed him by the shoulder, threatened him, and told him to support his sister.

The victim's brother testified that she wanted him to lie to support her abuse allegations against defendant. He also questioned her truthfulness. He never discussed sexual matters with defendant.

## Defendant's Daughter

Tia, one of defendant's daughters, testified her father was hard of hearing, especially on the phone. Because of this, defendant would sometimes say "yes" even though it was obvious he had not heard the question. Tia learned of the pretext call between the victim and defendant prior to speaking with a defense investigator.

## Diane Vergonet

Diane Vergonet dated defendant and had a sexual relationship with him beginning in July 2007, when she was about 63. Defendant had sexual problems and could not achieve an erection despite the couple's trying many different techniques. Vergonet also testified defendant was hard of hearing, particularly on the phone. Vergonet also stated defendant had scars on his penis.

## Defendant's Ex-Wife

JoAnne McCracken, defendant's ex-wife, testified they were married from 1972 through 1982. [N.3] They had one daughter, born in 1975. After surgery, defendant became impotent and unable to achieve an erection. The scar on defendant's penis was visible during sex.

5

[N.3. Defendant was not sure if he had been married five or six times.]

McCracken noticed defendant had developed hearing problems in the six months prior to trial. Even before his hearing problems appeared, defendant would sometimes seem confused.

Urologist

Dr. Robert Carter, defendant's urologist, testified defendant complained of erectile dysfunction. They discussed a possible penile prosthesis, involving a pump, in September 2008. Dr. Carter's review of defendant's medical records revealed defendant first reported erectile dysfunction in 2004.

Other Evidence

The defense presented evidence that the victim sent affectionate text messages to defendant in April and May 2008.

The victim's ballet teacher, Pamela Hayes, testified that she taught the victim for seven years. She was a gifted dancer but changed after meeting her boyfriend. After the victim became disruptive in class, Hayes began to fear she had become involved with drugs. Concerned, Hayes tried to talk to her, but the victim told her, "Dad loves [my boyfriend]" and that she and her boyfriend were going to marry.

One morning, the victim called Hayes and began making allegations against her father. Hayes could hear a voice in the background prompting her. When the victim came to ballet class, Hayes saw her rush up to each student to see if they had heard about her, behavior Hayes found odd.

Defendant's Testimony

Defendant testified in his own behalf. When he first met the victim and her brother, they lived with their mother in a filthy apartment. There was no food in the house and a neighbor took care of them because their mother was gone for long periods. After they moved in with defendant, he found their mother very verbally abusive. The couple married in 1999.

When the couple divorced, the children wanted to remain with defendant. Defendant spent approximately $100,000 and three years fighting for guardianship and later adoption. Defendant adopted the children because he was a Vietnam veteran and he wanted them to be entitled to his benefits.

In 1964 defendant's scrotum was crushed in an auto accident, resulting in ongoing sexual problems. In 1977, after several operations, defendant became completely impotent. Efforts to remedy his erectile dysfunction failed.

Defendant denied all of the victim's allegations and denied sexually

6

abusing her in any way. Had he molested her, defendant would not have allowed her to go to counseling.

Prior to meeting her boyfriend, the victim had been devoted to dance and music and was well behaved. She aspired to be a model, and defendant found she was sending photos of herself over the Internet to people who claimed to be photographers.

The victim met her boyfriend when she was 18. She lied about spending the night with him, and when defendant confronted her, she moved out.

Defendant worried about the relationship because the boyfriend wore a shirt with a marijuana leaf and sported numerous tattoos, including a big marijuana leaf on his back. However, the victim told defendant her boyfriend used marijuana for medical purposes. Defendant also noted changes in the victim's behavior that led him to believe she was using drugs, concerns echoed by her ballet teacher, Hayes.

After the victim offered marijuana to her 14-year-old brother, defendant decided to go to her apartment. He saw a water pipe and white powder with a razor blade on a table. When he confronted the boyfriend, the latter became angry and a violent confrontation ensued. Defendant believed the boyfriend was controlling the victim.

Defendant testified he was shocked when he read the transcript of the pretext call because he "didn't remember the conversation to that degree." At the time of the call, defendant had arrived home in the early morning hours after attending his sister's funeral out of state. He did not have hearing aids. [N.4]

[N.4. Defendant got hearing aids in September 2008. He was arrested in June 2008.]

According to defendant, a significant portion of the call was not recorded. In the unrecorded portion, the victim said she was in trouble and needed defendant's help. She told defendant her boyfriend was controlling and abusive. Defendant was frightened for her. All he wanted to do was to get her away from her boyfriend and back home.

During the call, defendant could not follow everything the victim said. At times he did not know whether she was talking about her boyfriend. When she talked about pregnancy, defendant thought she was talking about having a baby with her boyfriend. When she talked about having sex with him, defendant assumed she was talking about sex with her boyfriend. Defendant also assumed, when the victim talked about having sex when she was 12, that she was talking about sexual activity she engaged in after a school dance. Defendant described the victim's comments about marrying him as a joke.

Defendant denied ever seeing the lingerie before the items were

7

introduced at trial. He also denied seeing the pornographic videos prior to trial.

Verdict and Sentencing

Following nine hours of deliberation, the jury found defendant guilty on all counts. The court sentenced defendant to 24 years 8 months in state prison: six years on count one; consecutive sentences of two years for each count on counts two through nine; consecutive sentences of eight months for each count on counts ten through thirteen; and on counts fourteen and fifteen, a concurrent jail sentence. . . .

Lodged Doc. 10, Appendix A to Petition for Review, pp. 1-13.

Post-Conviction Proceedings

Petitioner appealed, and the California Court of Appeal affirmed the judgment on March 1, 2012. Lodged Doc. 10, Appendix A. The California Supreme Court denied review on May 9, 2012. Lodged Doc. 10.

Petitioner filed no applications for collateral relief in the state courts.

The federal petition, dated February 14, 2013, was docketed on February 20, 2013. ECF No. 1. Respondent answered on April 18, 2013. ECF No. 9. The answer asserts no procedural defenses. Id.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 131 S. Ct. 770, 785

1   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

2   absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

3   Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination where it is

4   unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

5   "The presumption may be overcome when there is reason to think some other explanation for the

6   state court's decision is more likely."  Id. at 785.

7         The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

8   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

9   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

10  standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

11  (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

12  may constitute "clearly established Federal law," but circuit law has persuasive value regarding

13  what law is "clearly established" and what constitutes "unreasonable application" of that law.

14  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

15  1057 (9th Cir. 2004).

16        A state court decision is "contrary to" clearly established federal law if the decision

17  "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

18  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

19  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

20  the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

21  was incorrect in the view of the federal habeas court; the state court decision must be objectively

22  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

23        Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

24  Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

25  reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

26  focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the

27  state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

28  state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th

1  Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

2  without a reasoned opinion.  In <u>Richter</u>, <u>supra</u>, the Supreme Court held that when a state court

3  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

4  determine what arguments or theories may have supported the state court's decision, and subject

5  those arguments or theories to § 2254(d) scrutiny.  <u>Richter</u>, 131 S. Ct. at 786.

6        Relief is also available under AEDPA where the state court predicated its adjudication of

7  a claim on an unreasonable factual determination.  <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005);

8  <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir.), <u>cert. denied</u>, 543 U.S. 1038 (2004).  The

9  statute explicitly limits this inquiry to the evidence that was before the state court.  28 U.S.C. §

10  2254(d)(2).

11        To prevail in federal habeas proceedings, a petitioner must establish the applicability of

12  one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional

13  invalidity of his custody under pre-AEDPA standards.  <u>Frantz v. Hazey</u>, 533 F.3d 724.  There is

14  no single prescribed order in which these two inquiries must be conducted.  <u>Id.</u> at 736-37.  The

15  AEDPA does not require the federal habeas court to adopt any one methodology.  <u>Lockyer v.</u>

16  <u>Andrade</u>, 538 U.S. at 71.

17  <u>DISCUSSION</u>

18  I.    <u>Claim One: Insufficient Evidence</u>

19      A.  <u>Petitioner's Allegations</u>

20        Petitioner contends that the victim's trial testimony was sufficient to support conviction

21  on only three counts, not all fifteen.  The trial court "compounded this error when it instructed the

22  jury pursuant to CALCRIM 3501."  ECF No. 1 at 14.[2]

23  _____

24  [2]  The jury was instructed as follows, pursuant to CALCRIM 3501: "The defendant is charged in counts 1 through 15, inclusive, of alleged offenses occurring sometime during the period of December 1, 1999, to April 27, 2005.  The People have presented evidence of more than one act

25  to prove that the defendant committed these offenses.  You must not find the defendant guilty unless: (1) You all agree that the People have proved that the defendant committed at least one of

26  these acts and you all agree on which act was committed for each offense; or (2) You all agree that the People have proved that the defendant committed all the acts alleged to have occurred

27  during this time period and have proved that the defendant committed at least the number of offenses charged."  RT 845-46.

28

10

In his petition for review in the California Supreme Court, which exhausted this claim, petitioner argued that the evidence at trial established only three specific instances of sexual abuse.  He contended that the jury was permitted to convict on additional counts absent unanimity on which specific incidents were proved, and without evidence sufficient to establish discrete instances of abuse on dates certain, all in violation of due process.  See Lodged Doc. 10 (Petition for Review) at 8-23.

B.  The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution."  Id. at 326; see also Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  In order to grant a writ of habeas corpus under AEDPA, the court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Juan H., 408 F.3d at 1274.  The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004).

Erroneous jury instructions do not support federal habeas relief unless the infirm instruction so infected the entire trial that the resulting conviction violates due process.  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]'").  The challenged instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record

11

1   overall.  Estelle, 502 U.S. at 72.  Moreover, relief is only available if there is a reasonable

2   likelihood that the jury has applied the challenged instruction in a way that violates the

3   Constitution.  Id. at 72–73.

4          C.   The State Court's Ruling

5          This claim was exhausted on direct appeal.  Because the California Supreme Court denied

6   discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

7   decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

8   501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

9          The state appellate court ruled as follows:

10             Defendant argues the prosecution provided evidence on only three
               counts, leaving the remaining counts supported by only generic
11             accusations. This generic testimony is insufficient to support the
               other counts. Although defendant acknowledges that under People
12             v. Jones (1990) 51 Cal.3d 294 (Jones) such generic testimony does
               not necessarily violate the constitutional jury unanimity
13             requirement, he argues Jones is distinguishable and contrary to
               United States constitutional law. [N.5]
14
               [N.5. The court instructed the jury on unanimity pursuant to
15             CALCRIM No. 3501.]

16             When considering the sufficiency of the evidence in support of a
               criminal conviction, we determine whether, after considering the
17             entire record, a rational trier of fact could find the defendant guilty
               beyond a reasonable doubt. We view the evidence in the light most
18             favorable to the prosecution and presume the existence of every fact
               the trier could reasonably deduce from the evidence. We must
19             ensure the evidence is reasonable, credible, and of solid value, but
               we defer to the trial court to determine the credibility of witnesses
20             and the veracity of the facts on which that determination depends.
               (Jones, supra, 51 Cal.3d at p. 314.)
21
               Jones took up the troubling issue of "generic" testimony by child
22             abuse victims and its impact on the due process rights of defendants
               in the context of the sufficiency of the evidence. The court noted
23             molestation cases present unique, paradoxical problems of proof. A
               young victim, molested over a long period by someone residing in
24             the home, may not have the ability to distinguish or identify
               specific incidents or dates of molestation. In recognition of this
25             problem, the court sought to craft an evidentiary standard to assure
               a resident child molester is not immunized from liability because he
26             molested his victim over an extended period of time. (Jones, supra,
               51 Cal.3d at p. 305.)
27
               Jones developed the level of specificity needed to provide sufficient
28             evidence in abuse cases involving generic testimony: "The victim,

                                          12

of course must describe the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct . . . . Moreover, the victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged in the information or indictment . . . . Finally, the victim must be able to describe the general time period in which these acts occurred . . . to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (Jones, supra, 51 Cal.3d at p. 316.)

In People v. Matute (2002) 103 Cal.App.4th 1437, the court in rejecting the defendant's due process challenge extended Jones's approach to generic testimony to a victim who was 15 and 16 years old at the time of the crimes. The Matute court reasoned: "The Jones court acknowledged that 'even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance.' [Citation.] The fact J. M. was 15 and 16 at the time of the crimes involved here makes little difference with regard to her inability to differentiate among the continual rapes perpetrated by defendant." (Id. at p. 1447.)

Defendant challenges the bulk of his convictions on a variety of grounds based on Jones. [N.6] Preliminarily, defendant asserts sufficient evidence supports only, at most, counts one, four, and five. We disagree.

[N.6. Specifically, defendant contends the record is sufficient to support conviction on counts one, four, and five, and that counts two, three, and six through fifteen should be reversed. (Reply 5, fn. 3)]

The victim testified extensively about numerous sexual acts over a long period of time. However, she also specifically described the kind of act, the number of acts, and the general time period sufficient to support each of the counts as required by Jones. She testified about defendant's touching when she was 11; sexual intercourse three times a week beginning when she was 12 and lasting until she was 13 or 14; sexual acts that became less frequent when she turned 15, occurring only once or twice a week; and defendant's performing the same sex acts only once a week when the victim was 17.

Defendant argues the victim's testimony differs from that of the victim in Matute, which the appellate court found sufficient. He contends the charges in Matute were uniform, with only one type of act allegedly committed once a month. In addition, in Matute, one allegation was confirmed by a rape examination revealing the defendant's sperm, and another resulted in an abortion. Defendant also stresses the victim's failure to disclose the abuse despite the counseling in conjunction with the guardianship and adoption

13

1    proceedings.

2    Despite defendant's attempts to distinguish <u>Matute</u>, we find its
     basic tenets apply in the present case. The multiplicity of sexual
3    activity, the gaps due to defendant's health issues, and the lack of
     physical evidence do not render the victim's testimony insufficient
4    to support defendant's convictions. She testified to specific acts at a
     specific frequency during a specific time period. This is what <u>Jones</u>
5    and <u>Matute</u> found sufficient. As for the lack of physical evidence,
     the prosecution produced the phone call between defendant and the
6    victim, providing corroboration for her claims.

7    The court, mindful of the victim's generic testimony, instructed the
     jury on the need for unanimity with CALJIC No. 3501, an
8    instruction based on <u>Jones</u>. The court instructed: "The defendant is
     charged in counts 1 through 15, inclusive, of alleged offenses
9    occurring sometime during the period of December 1, 1999, to
     April 27, 2005. [¶] The People have presented evidence of more
10   than one act to prove that the defendant committed these offenses.
     [¶] You must not find the defendant guilty unless: [¶] 1. You all
11   agree that the People have proved that the defendant committed at
     least one of these acts and you all agree on which act he committed
12   for each offense; or [¶] 2. You all agree that the People have proved
     that the defendant committed all the acts alleged to have occurred
13   during this time period and have proved that the defendant
     committed at least the number of offenses charged."
14
     Defendant also contends that, unlike <u>Jones</u>, the prosecution here
15   informed the jury it could use the first and last sex acts within each
     age bracket to convict him. According to defendant: "In order for
16   the jury to convict appellant as charged they had to agree he
     committed each and every one of some 5,100 sex crimes." Not so.
17   The jury had only to agree on the first and last act of each time
     period, satisfying the requirement under <u>Jones</u> that the victim
18   testified to the number of acts with sufficient certainty to support
     each of the counts. Here, the victim testified as to specific acts and
19   their frequency at each age alleged in the information. [N.7]

20   [N.7. We also reject defendant's contention that the lack of a jury
     unanimity requirement granted the prosecutor unbridled discretion.
21   The prosecution complied with <u>Jones</u> in specifying the kinds of acts
     committed, the number of acts, and the general time period within
22   which the acts occurred. (<u>Jones</u>, <u>supra</u>, 51 Cal.3d at p. 316.) These
     requirements curtail any possible prosecutorial overcharging of sex
23   crimes.]

24   Defendant argues <u>Jones</u> conflicts with federal constitutional law.
     However, as defendant concedes, we must follow <u>Jones</u>. (<u>Auto</u>
25   <u>Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455.)

26   Lodged Doc. 10, Appendix A to Petition for Review, pp. 13-18.

27   ////

28   ////

14

D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

This court begins where the state court left off, with the unanswered question whether California law regarding the sufficiency of generic testimony, as articulated in People v. Jones, 51 Cal. 3d 294 (1990) and People v. Matute, 103 Cal. App. 4th 1437 (2002), conflicts with clearly established federal law.  The Ninth Circuit has found in a closely related context that the Jones framework is neither contrary to nor an unreasonable application of United States Supreme Court precedent.  See Brodit v. Cambra, 350 F.3d 985, 988-89 (9th Cir. 2003) (rejecting claim that petitioner was denied notice of charges, in violation of due process, by information alleging sexual abuse on unspecified dates as approved in Jones), cert. denied, 542 U.S. 925 (2004). Brodit holds that § 2254(d)(1) precludes a claim that due process is violated by the absence in the charging document of precise dates.  Id.  It follows that § 2254(d)(1) also precludes a claim that due process is violated by conviction in the absence of evidence to establish, or jury unanimity regarding, precise dates.

A claim even more similar to the one presented here was addressed by the district court in Heller v. Mendoza-Powers, 2008 U.S. Dist. LEXIS 78911 (N.D. Cal. 2008).  That court rejected a claim that because the victim's testimony about ongoing sexual abuse was generic, the evidence was insufficient to support the convictions.  As the Heller court explained,

> Petitioner has cited no United States Supreme Court precedent regarding the use of generic testimony in cases such as his, and the court has found none. What authority exists supports the Court of Appeal's decision. First, criminal defendants in state court have no federal constitutional right to a unanimous jury verdict. See Apodaca v. Oregon, 406 U.S. 404, 410-12, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972). Second, the jury was instructed that in order to return a guilty verdict, all jurors had to agree that defendant committed the same act or acts. The jury returned a verdict finding that petitioner violated California Penal Code section 288(a). Pursuant to the jury instruction, this meant all the jurors had agreed that he committed the same act or acts of molestation. Greer v. Miller, 483 U.S. 756, 766, n. 8, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (presumption that juries follow instructions). Third, a similar argument regarding juror unanimity was rejected in U.S. v. Hawpetoss where the defendant was convicted of sexual abuse of a minor that had lived with him, based on generic evidence. 388 F.Supp.2d [952,] 963 [E.D. Wis. 2005]. A similar instruction had been given requiring the jury to unanimously agree on the particular offense the defendant committed. Id. at 964. The district judge denied defendant's motion for judgment of acquittal, finding that

the defendant's due process rights were not violated even though the prosecution relied on generic evidence because of the presumption that the jury followed the instruction to agree unanimously on the particular offense the defendant committed.  Id. at 964 - 65.

For these reasons, the Court of Appeal's decision to uphold petitioner's conviction was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

Id. at *11-13 (footnotes omitted).

The undersigned finds the Heller court's reasoning persuasive.  The absence of a federal constitutional right to unanimity regarding the underlying facts, Apodaca v. Oregon, 406 U.S. 404, 410-12 (1972), undermines petitioner's claim that Jones permits an unconstitutional result. Because the evidence supports the verdicts under California law as interpreted by the California Supreme Court, Jackson is satisfied.  See Chein, 373 F.3d at 983.  Because California does not make the precise dates of discrete acts of sexual abuse a substantive element of the offense, the absence of such evidence does not offend due process.  See id.  For the same reasons, CALCRIM 3501 is not unconstitutional.  See Ocampo v. Biter, 2013 U.S. Dist. LEXIS 74787 at *20-27 (C.D. Cal. 2013) (Report and Recommendation), adopted, 2013 U.S. Dist. LEXIS 74827 (C.D. Cal. 2013)

The state court applied the correct due process standard (". . . we determine whether, after considering the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. . . ."), and applied it reasonably.  The evidence in this case did not compel a guilty verdict, to be sure.  Petitioner impeached the victim's testimony both directly and indirectly, including with evidence that he was medically incapable of some of the sexual acts alleged.  Petitioner also presented a plausible motive for the victim to falsely accuse him. However, this court may not revisit the jury's credibility determination.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) (credibility determinations are outside the scope of review under Jackson). The question on post-conviction review is not whether the reviewing court is persuaded of guilt beyond a reasonable doubt, but whether any rational juror could be so persuaded when all inferences and all credibility determinations are drawn in favor of the prosecution.  Id.; Jackson, 443 U.S. at 319; Juan H., 408 F.3d at 1274-75.  Because the victim's testimony was sufficient to

1    support the verdict and the jury believed her, the state court's answer to that question was not

2    unreasonable.  Accordingly, § 2254(d) bars relief.

3        II.    Claim Two: Expert Testimony Regarding Child Sexual Abuse Accommodation

4                  Syndrome Violated Due Process

5        A.  Petitioner's Allegations

6        Petitioner contends that his right to due process was violated by the admission of Dr.

7    Urquiza's expert testimony regarding child sexual abuse accommodation syndrome (CSAAS).

8    He alleges further that counsel rendered ineffective assistance by failing to object to the

9    testimony.  ECF No. 1 at 7.

10       B.  The Clearly Established Federal Law

11       The erroneous admission of evidence violates due process only if the evidence is so

12   irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair.  Estelle v.

13   McGuire, 502 U.S. 62 (1991).

14       To establish a constitutional violation based on ineffective assistance of counsel, a

15   petitioner must show (1) that counsel's representation fell below an objective standard of

16   reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

17   Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

18   adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

19   errors, the result of the proceeding would have been different.  Id. at 693-94.

20       C.  The State Court's Ruling

21       The opinion of the California Court of Appeal constitutes the last reasoned decision on the

22   merits and is the subject of habeas review in this court.  See Ortiz v. Yates, 704 F.3d at 1034.

23   That court ruled as follows:

24           Defendant challenges the admission of expert testimony by Dr.
        Urquiza regarding child sexual abuse accommodation syndrome.

25           He argues the testimony improperly allowed the jury to infer the
        victim's allegations were true, and the court erred in instructing the

26           jury that it could use this evidence in evaluating her credibility.
        Defendant acknowledges defense counsel failed to object to the

27           testimony or instruction at trial, but he argues such failures
        constitute ineffective assistance of counsel.

28

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient and fell below an objective standard of reasonableness; and it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (Strickland v. Washington (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694].) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (Id. at p. 694 [80 L.Ed.2d at p. 698].)

Expert testimony is admissible if it is related to a subject sufficiently beyond common experience that the expert would assist the jury. (Evid. Code, § 801, subd. (a).) Such testimony is excluded only if it would add nothing to the jury's common fund of information. We reverse the trial court's ruling admitting expert testimony only where the court abused its discretion. (People v. McAlpin (1991) 53 Cal.3d 1289, 1299-1300 (McAlpin).)

Numerous courts have found expert testimony concerning the syndrome properly admitted in abuse cases. (People v. Wells (2004) 118 Cal.App.4th 179, 188; People v. Yovanov (1999) 69 Cal.App.4th 392, 406-407.) Such expert testimony is admissible to show that a victim's reactions are not inconsistent with having been molested. However, expert testimony regarding the syndrome may not be used to determine whether a victim's claims are true. (People v. Bowker (1988) 203 Cal.App.3d 385, 393-394.)

We do not find Urquiza's testimony improperly led the jury to infer the victim's claims were true. Urquiza testified he was not familiar with the victim, had not read the documents related to the case, and was not offering an opinion as to whether she had been molested. The heart of Urquiza's testimony was a generalized account of the syndrome and its impact on an abused child. Urquiza also acknowledged research revealed some children have made false abuse allegations.

Defendant also claims similarities between Urquiza's testimony and the facts of the present case allowed the jury to conclude the victim had been molested. According to defendant, "Here, Dr. Urquiza's testimony effectively placed [the victim] in the group of molested children abused by someone they had an on-going relationship with and [who] delay disclosure until after the age of eighteen."

We disagree. Urquiza's testimony regarding the syndrome centered on general characteristics of abused children and their reactions to molestation. Not surprisingly, some of the aspects of the syndrome applied to the facts of this case and some did not. Such expert opinion did not invade the jury's province, denying defendant a fair trial.

The court in People v. Housley (1992) 6 Cal.App.4th 947 (Housley) faced a similar challenge to expert testimony regarding child sexual abuse accommodation syndrome. In Housley, the expert testified she had never met or examined the victim and explained it was not uncommon for abuse victims to delay reporting the abuse or to later recant their stories. (Id. at p. 952.)

18

The <u>Housely</u> court rejected the defendant's claim that the testimony was improperly used to suggest the molestations actually occurred. (<u>Housely</u>, <u>supra</u>, 6 Cal.App.4th at p. 954.) The court noted the expert testimony was clearly intended to help explain the victim's delay in reporting the abuse and her last-minute recantation of the charges. Therefore, the expert testimony aided the jury's assessment of the victim's behavior. Moreover, "[c]ontrary to appellant's position, the doctor did not suggest Maryella's claims were credible simply because she exhibited some behaviors common to abuse victims. The doctor advised the jury . . . that she had never met Maryella and was unfamiliar with the particulars of the case. It is thus unlikely the jury would interpret her statements as a testimonial to Maryella's credibility." (<u>Id.</u> at pp. 955-956.)

Here, defendant argues that since the victim did not recant her accusations against him, <u>Housely</u> does not apply. However, <u>Housely</u> found the "psychological testimony was properly used to dispel certain common misconceptions regarding the behavior of abuse victims." (<u>Housley</u>, supra, 6 Cal.App.4th at p. 956.) In the instant case, the psychological testimony provided an explanation for the victim's failure to report the years of abuse until she turned 18.

Defendant also contends the court erred by instructing the jury that syndrome evidence could be used in evaluating the credibility of the victim's testimony. According to defendant, CALCRIM No. 1193 improperly lightens the prosecution's burden of proof.

The court instructed the jury with CALCRIM No. 1193: "You have heard testimony from Dr. Anthony Urquiza regarding Child Sexual Abuse Accommodation Syndrome. Dr. Anthony Urquiza'[s] testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." The court also instructed on the reasonable doubt standard. (CALCRIM No. 220.)

CALCRIM No. 1193 told the jury that expert testimony on the syndrome was not evidence of defendant's guilt, but such evidence could be considered only to determine whether the victim's conduct was consistent with that of a molestation victim. In <u>McAlpin</u>, <u>supra</u>, 53 Cal.3d 1289, the Supreme Court reasoned: "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (<u>Id.</u> at pp. 1300-1301, fn omitted.)

19

1
2
3
4

> CALCRIM No. 1193 comports with <u>McAlpin</u>. In the present case, defendant challenged the credibility of the victim's accusations of abuse. Evidence of child sexual abuse accommodation syndrome is pertinent and admissible when a defendant challenges the victim's credibility. (<u>People v. Patino</u> (1994) 26 Cal.App.4th 1737, 1745.) We find no error in the court's instructions and no ineffective assistance of counsel in connection with the expert testimony.

5 Lodged Doc. 10, Appendix A to Petition for Review, pp. 18-22.

6     D.  <u>Objective Reasonableness Under 28 U.S.C. § 2254(d)</u>

7     The state court's rejection of this claim was not unreasonable.  The Ninth Circuit has held

8 that relief is not available under AEDPA for a claim that admission of CSAAS evidence violates

9 due process.  <u>Brodit v. Cambra</u>, 350 F.3d 985, 991 (9th Cir. 2003), <u>cert. denied</u>, 542 U.S. 925

10 (2004).  <u>Brodit</u> forecloses petitioner's claim here.

11     As in <u>Brodit</u>, the jury in this case was instructed that the expert testimony was to be

12 considered only for the limited purpose of assessing the complaining witness's credibility, and

13 not as evidence that petitioner committed any of the crimes charged against him.  <u>See</u> RT 845.

14 Juries are presumed to follow their instructions.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).

15 Accordingly, in the context of petitioner's trial as a whole, the disputed testimony did not so

16 infect the proceedings as to render them fundamentally unfair.  <u>See</u> <u>Estelle</u>, 502 U.S. 62.

17     The CSAAS evidence was admissible under California law, a determination which is

18 unreviewable in this court.  <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68; <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76

19 (2005).  Accordingly, counsel's failure to object did not constitute unreasonable performance.

20 Moreover, because any objection would have been overruled, the failure to object cannot have

21 affected the outcome.  <u>See</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 382 (1986) (to prevail under

22 <u>Strickland</u>, petitioner must establish that foregone motion would have been meritorious).  For

23 these reasons, the state court reasonably rejected the ineffective assistance component of

24 petitioner's claim.

25     III.    <u>Claim Three:  Ineffective Assistance of Counsel</u>

26     A.  <u>Petitioner's Allegations</u>

27     Petitioner's third ground for relief reads as follows:

28 ////

Ineffective assistance of counsel because he failed to recognize that psychologists are mandated reporters and failed to obtain and introduce a psychological evaluation of me at trial.

My attorney questioned Dr. Urquiza and during the cross-examination posed the hypothetical that a young person could have discussed these allegations with a psychologist. Dr. Urquiza relied that psychologists are mandated reporters and that such a report could not be maintained confidentially by the psychologist. This caused my attorney to raise an[] illusory defense that evaporate completely, leaving behind a solid explanation for the complaining witness's delay of disclosure.

Also, Dr. Nakagawa was appointed to prepare a report after the conviction and she opined that defendant was not predisposed to committing a sexual offense. This should have been pursued prior to trial so that this evidence could have been presented to the jury.

ECF No. 1 at 8-9.

B.  The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 692, 694 (1984). Prejudice means that the error actually had an adverse effect on the defense. There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 693-94.

C.  The State Court's Ruling

The California Court of Appeal ruled as follows:

Defendant also argues counsel performed ineffectively in two other instances: failing to recognize that psychologists are mandated reporters, and failing to obtain and introduce a psychological evaluation at trial. Defendant argues this was a close case and such errors were prejudicial.

In the first instance, defense counsel cross-examined Urquiza regarding the victim's contact with a psychologist during the adoption proceedings. Defense counsel posed the hypothetical in which an alleged victim had contact with a psychologist. Urquiza stated a report of sexual abuse could not be confidential since psychologists are required to report such abuse and disclose the requirement to the patient.

Defendant argues trial counsel's failure to recognize psychologists are required to report abuse led him to raise an "illusory defense that evaporated completely . . . , leaving behind a solid explanation

for [the victim's] delay of disclosure." However, the victim herself provided a plausible explanation during trial for her failure to report the abuse to psychologists during the adoption proceedings. She testified defendant told her if she told anyone about the abuse she would be taken away from him and left with no one to take care of her. Defense counsel's misstep on the issue of confidentiality did not constitute ineffective assistance of counsel.

In the second instance, defendant argues counsel performed ineffectively in failing to obtain and introduce a psychological evaluation at trial. Defendant notes Dr. Nakagawa's report found defendant not predisposed to commit a sexual offense; therefore, there can be no satisfactory explanation for defense counsel's error.

If the record sheds no light on why defense counsel failed to act in the manner challenged, we must reject a claim of ineffective assistance unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (People v. Mendoza Tello (1997) 15 Cal.4th 264, 266.) Here, the record does not reveal why defense counsel did not introduce a psychological evaluation at trial. Nor can we find there is no satisfactory explanation for defense counsel's conduct. Even though Dr. Nakagawa's report was positive, there is no guarantee another psychologist would have reached an identical conclusion. Nor under Jones is the trial court required to admit expert testimony as to a defendant's character. Given the risks in introducing such testimony, we cannot find counsel ineffective for failing to do so.

Lodged Doc. 10, Appendix A to Petition for Review, pp. 23-24.

D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

The state court's rejection of petitioner's Strickland claim was not unreasonable.

The court characterized counsel's question to Dr. Urquiza as a "misstep," but held that it did not constitute ineffective assistance of counsel.  The court highlighted the fact that the victim had provided an independent explanation for her failure to disclose the abuse during an adoption-related psychological interview.  The appellate court's approach is consistent with clearly established federal law, which provides that relief may be denied for lack of prejudice without addressing the performance prong.  See Strickland, 466 U.S. at 697.  In light of the victim's explanation for her previous failure to disclose the abuse (that petitioner had threatened her with abandonment if she told anyone), counsel's unintended elicitation of another possible explanation did not have a likely prejudicial effect on the outcome.  At least, it was not unreasonable for the state court to so conclude.

Regarding the failure to offer defense expert testimony, the state court reasonably found

1  that the record on appeal was inadequate to support the ineffective assistance claim.  Petitioner

2  did not attempt to supplement his claim with extra-record evidence in state habeas proceedings,

3  and has thus forfeited the right to do so here.  See Cullen v. Pinholster, 131 S.Ct. 1388, 1398

4  (2011) (federal habeas review under § 2254(d) is limited to the evidentiary record that was before

5  the state court).[3]

6       As the appellate court noted, California law does not require admission of expert character

7  evidence regarding the defendant's lack of propensity to sexually abuse children.  In appropriate

8  cases, however, such evidence may be permitted.  People v. Jones, 51 Cal. 3d 294, 320 (1990)

9  (". . . the defendant may be permitted to introduce expert character evidence, based on

10  standardized tests and personal interviews, to the effect that his personality profile does not

11  include a capacity for deviant behavior against children.") (citation omitted).  Accordingly, it

12  cannot be assumed that such an effort in this case would necessarily have been futile.

13       However, even if this court were to assume that counsel unreasonably failed to develop

14  and proffer expert psychological testimony, petitioner's claim would fail for want of a prejudice

15  showing.  See Strickland, 466 U.S. at 697.  Petitioner relies on the report of Dr. Janice Nakagawa,

16  CT 258-66, which was prepared for sentencing purposes.  Dr. Nakagawa offered no opinion on

17  the question whether petitioner's "personality profile. . . include[d] a *capacity* for deviant

18  behavior against children."  She found that petitioner is not predisposed to the commission of

19  sexual offenses "by reason of mental defect or disease," and that he "likely has no sexual

20  preoccupation with minors."  CT 266.  She attributed his offenses against his adopted daughter to

21  a combination of her ready availability to him and his own psychological conflicts regarding his

22  sexuality.  CT 265 (noting petitioner's rejection of his own psychosexual urges), 266 (noting

23  petitioner's difficulty coming to terms with his impotence, continued sexual drives, and

24  convenience of the victim as a focus for his sexual attention).  While Dr. Nakagawa concluded

25  that petitioner was not a pedophile, CT 266, her report was replete with unflattering psychological

26  information that could have been used by the prosecution to bolster its case that petitioner

27

28  [3]  The federal petition is not supported by any exhibits, and relies entirely on the state court record.

1    targeted his daughter for his sexual gratification.  That was quite clearly Dr. Nakagawa's view.

2    Accordingly, petitioner has failed to demonstrate a reasonable likelihood of a different result

3    absent counsel's alleged error.

4         For all these reasons, petitioner is not entitled to relief on his ineffective assistance claim.

5    IV.   Claim Four:  Prosecutorial Misconduct

6         A.  Petitioner's Allegations

7         Petitioner identifies three instances of alleged prosecutorial misconduct.  He argues that

8    the prosecutor (1) improperly invoked the prestige of his office, (2) misstated the unanimity

9    requirement, and (3) asked the jury to look at the events through the victim's eyes.  ECF No. 1 at

10   10.  On direct appeal, petitioner pointed to the following statements in the prosecutor's closing

11   argument:[4]

12        The prosecutor noted that it was difficult for a victim to specify particular dates on which

13   offenses occurred.  The prosecutor stated: "What we typically do" is to determine if it happened

14   twice or more, then "we talk about the first and last.  That's the easiest way for us to kind of break

15   it down when we have more than one."  RT 738.

16        Regarding the unanimity instruction, the prosecutor commented that the jury could

17   comply with the instruction by finding "that I proved that the defendant committed at least one of

18   these acts and you all agree which one.  So you have to agree there was a first time that he

19   touched her."  RT 740.

20        Finally, the prosecutor advised the jury to "Think about it from [the victim's] perspective.

21   If she's making this up . . . ."  Defense counsel objected and the court sustained the objection.

22   The prosecution then stated: "Think about it from [the victim's] perspective."  Defense counsel

23   again objected and the trial court sustained the objection.  RT 778.

24        B.  The Clearly Established Federal Law

25        A prosecutor's improper statements violate the constitution only where they "so infect[]

26   the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v.

27

28   [4]  Lodged Doc. 10.  (Petition for Review) at 31-32.

24

1  Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

2  (1974) (internal quotation marks omitted)).  It is not enough that the remarks were "undesirable or

3  even universally condemned."  Darden, 477 U.S. at 181.  Fundamental fairness must be assessed

4  in context of the trial as a whole, including the weight of the evidence, the defense opportunity to

5  respond, and the instructions given to the jury.  Id. at 181-82.

6  　　　C.  The State Court's Ruling

7  　　　The California Court of Appeal ruled as follows:

8  　　　　A prosecutor's conduct violates the federal Constitution when it
   comprises a pattern of conduct so egregious that it infects the trial
9  　　　　with such unfairness as to deny the defendant due process.
   Prosecutorial conduct that does not render a criminal trial
10 　　　　fundamentally unfair is prosecutorial misconduct under state law
   only if it involves the use of deceptive or reprehensible methods to
11 　　　　attempt to persuade either the court or the jury. (People v. Samayoa
   (1997) 15 Cal.4th 795, 841 (Samayoa).)
12

13 　　　　As a general rule, a defendant must object to prosecutorial
   misconduct and request an admonition when the misconduct occurs.
14 　　　　(Samayoa, supra, 15 Cal.4th at p. 841.) The defendant's failure to
   object or request an admonition is excused if either would be futile
15 　　　　or an admonition would not have cured the harm caused by the
   misconduct. (People v. Hill (1998) 17 Cal.4th 800, 820.)

16 　　　　Invoking Prestige or Experience

17 　　　　A prosecutor commits misconduct by invoking his or her personal
   prestige or experience in an effort to bolster the case against a
18 　　　　defendant. (People v. Riggs (2008) 44 Cal.4th 248, 302.) Defendant
   argues the prosecution invoked the prestige of his office and
19 　　　　referred to facts not in evidence when he argued that "we typically"
   use first and last offenses in abuse cases based on generic
20 　　　　testimony.

21 　　　　The prosecutor made the comments in question while discussing an
   approach to the numerous counts against defendant. He suggested
22 　　　　count one was defendant's rubbing the victim's breasts or another
   crime against her when she was 11; counts two and three, the first
23 　　　　and last oral copulations at age 12; counts four and five, the first
   and last acts of sexual intercourse at age 12; counts six and seven,
24 　　　　the first and last acts of oral copulation at age 13; counts eight and
   nine, the first and last acts of sexual intercourse at age 13; counts
25 　　　　ten and eleven, the first and last acts of sexual intercourse at age 14;
   counts twelve and thirteen, the first and last acts of sexual
26 　　　　intercourse at age 15; and counts fourteen and fifteen, the first and
   last acts of sexual intercourse at ages 16 and 17

27

28 　　　　The prosecution commented that "What we typically do . . . we
   know there is a first time . . . we know there is a last time. . . . [¶] . .

. [¶] So what we do when we have multiple counts, we talk about the first and last." These comments outlined the approach approved in Jones and provided the jury with a permissible approach for evaluating the evidence. The prosecutor did not invoke the prestige of his office, or refer to his legal experience, in providing this approach.

Unanimity Instruction

The prosecution, in discussing the unanimity instruction, told the jury one approach would be for the jury to agree on an act for each count. Since defendant claimed no molestations took place, the jury could agree that the prosecution proved defendant committed all the acts and therefore the 15 counts alleged. Defendant argues these comments misstated the law.

We disagree. The court instructed the jury on the unanimity requirement, an instruction based on Jones. (CALCRIM No. 3501.) The prosecution's comments did not run afoul of either Jones or the instruction.

The Victim's Perspective

A prosecutor commits misconduct when he invites jurors to view the case from the perspective of the alleged victim. Such comments invite the jury to depart from their required impartiality and, to the extent they appeal to the jury's sympathy or passion, they are inappropriate. (People v. Fields (1983) 35 Cal.3d 329, 362; People v. Lopez (2008) 42 Cal.4th 960, 969-970.) Defendant asserts the prosecution's statement that the jury should "think about it from [the victim's] perspective" was an effort to garner the jury's sympathy.

However, when the prosecutor urged jurors to view the case through the victim's eyes, he referred to the pretext phone call she made with the police, which he argued she would not have participated in if she were concocting the molestation allegations. Seeing the case through the victim's eyes in this context was considering her credibility given her participation in the phone call, which, if she were lying, would have resulted in adamant denials from defendant during the course of the call.

In addition, defense counsel objected to the statements, and the court sustained the objections. The court also instructed the jury not to let sympathy influence its decision. (CALCRIM No. 200.) We find no misconduct.

Lodged Doc. 10, Appendix A to Petition for Review, pp. 24-28.

   D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

   The state court correctly stated the "fundamental fairness" standard that governs this

claim.  The state court then reasonably applied that standard.

26

1    First, nothing about the prosecutor's rhetorical use of the word "we" can reasonably be

2 construed as an invocation of the prestige of the District Attorney's Office or the individual

3 prosecutor's experience.  The jury most likely interpreted the challenged statement as an

4 explanation of how ongoing child sex abuse cases are analyzed by those who are called upon to

5 do so, including lawyers, judges and jurors.

6    Second, the argument regarding the unanimity requirement was not inconsistent with

7 California law.  The state court's resolution of that issue may not be revisited here.  See Estelle v.

8 McGuire, 502 U.S. at 67-68; Bradshaw v. Richey, 546 U.S. at 76.  For the same reasons that the

9 generic victim testimony and instruction with CALCRIM 3501did not violate due process, neither

10 did this argument on that issue.

11    Finally, the reference to seeing through the victim's eyes was made in the specific context

12 of discussing the credibility of the victim's testimony.  The prosecutor was urging the jury to

13 consider the perspective and circumstances of the witness in assessing her words and actions and

14 deciding how much credence to give her testimony.  When considered in context, the statement

15 was within the bounds of permissible commentary on the assessment of witness credibility.

16    In sum, the statements to which petitioner objects did not individually or cumulatively

17 infect the trial with unfairness.  Especially when they are assessed in context of the trial as a

18 whole, including the weight of the evidence, the defense opportunity to respond, and the

19 instructions given to the jury, the statements are unlikely to have had any prejudicial effect.  The

20 state court ruled reasonably that due process was not offended.

21                                                CONCLUSION

22    It is HEREBY ORDERED that the Clerk randomly assign this case to a United States

23 District Judge.

24    For all the reasons set forth above, IT IS RECOMMENDED that petitioner's application

25 for federal habeas corpus be denied.

26    These findings and recommendations are submitted to the United States District Judge

27 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-eight

28 days after being served with these findings and recommendations, any party may file written

1    objections with the court and serve a copy on all parties.  Such a document should be captioned

2    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

3    he shall also address whether a certificate of appealability should issue and, if so, why and as to

4    which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

5    applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.  §

6    2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

7    service of the objections.  The parties are advised that failure to file objections within the

8    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

9    F.2d 1153 (9th Cir. 1991).

10   DATED: January 28, 2015

11

12   ALLISON CLAIRE
     UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28